PEDEN IRON & STEEL CO. v. JENKINS
et al. (No. 336.)

(Court of Civil Appeals of Texas. Beaumont.
April 22, 1918. Rehearing Denied May 1,
1918. On Second Motion for Rehearing, May
22, 1918.)

1. TRIAL ⬤═412—WAIVER OF OBJECTION TO
EVIDENCE—CROSS-EXAMINATION.

If it was error for a witness to testify as
to value of certain neighboring oil land as a
basis for fixing the value of oil lands in suit,
the objection was waived, where the same
ground was covered on cross-examination, and
testimony as to value of still other lands was
brought out.

2. EVIDENCE ⬤═142(4)—SIMILAR FACTS—VAL-
UE OF OIL LEASE.

In arriving at the value of a certain oil
lease at a certain time, it was proper to show
the value of a similar adjoining lease, the con-
ditions regarding the two leases, improvements,
quality, etc., being alike, and what the ad-
joining lease could have been sold for under the
existing conditions.

3. APPEAL AND ERROR ⬤═1050(1)—HARMLESS
ERROR—EVIDENCE.

Where oil scouts admitted on the stand that
an oil lease was worth what it could be sold
for, it was harmless, if error, to allow the other
party to show what oil leases and stock were
selling for in the locality at the time.

4. EVIDENCE ⬤═501(7)—OPINION EVIDENCE—
BASIS OF OPINION.

A witness, testifying as to the value of an
oil lease at a certain time, was properly allowed
to state facts concerning transactions in the
same locality at the time, on which he based his
opinion.

5. EVIDENCE ⬤═151(1)—VALUATION OF OIL
LEASE—REASONS.

In an action by creditor against stockhold-
ers individually, because of alleged overvaluation
of the oil land given for the stock, a stockholder,
who was one of the incorporators, was properly
allowed to testify as to reasons for placing such
value on the oil lands.

6. EVIDENCE ⬤═142(1)—SIMILAR FACTS—VAL-
UE OF OIL LEASE.

In arriving at the value of an oil lease on
10 acres, it was not improper to admit evidence
of price of fractions of acres sold adjoining such
land.

7. EVIDENCE ⬤═113(6)—VALUE OF OIL LEASE
—SALE OF STOCK.

In arriving at the value of an oil lease
claimed to have been overvalued by the incor-
porators, it was proper to show what specific
corporate stock sold for, or could have been
sold for, because what the stock would sell for
was the value of the lease.

8. EVIDENCE ⬤═113(6)—VALUE OF OIL LEASE
—EXCHANGE OF STOCK.

In arriving at the value of an oil lease, it
was proper to admit evidence of exchanges of
property for stock of the corporation, where the
value of such property was shown; its weight
being for the jury.

9. CORPORATIONS ⬤═269(3)—STOCK—VALUA-
TION OF PROPERTY.

Evidence held sufficient to sustain a finding
that incorporators did not overvalue an oil
lease given for stock in their statement to the
secretary of state, so as to render them individ-
ually liable for debts of the corporation.

10. CORPORATIONS ⬤═232(3)—STOCKHOLDERS'
LIABILITY—VALUATION OF PROPERTY.

Acceptance by the secretary of state of the
valuation of an oil lease placed upon it by in-
corporators, who issued stock on such valua-
tion, renders such valuation prima facie correct,

and it can only be called in question in case of
fraud.

11. CORPORATIONS ⬤═269(2)—EVIDENCE—AC-
TION AGAINST STOCKHOLDERS — "GOOD
FAITH."

In action by creditor against stockholders
individually by reason of alleged overvaluation
of an oil lease in statements to the secretary
of state, any surrounding circumstances affect-
ing the property, and methods of arriving at
the valuation, were admissible to show good
faith, which, as used in law, simply means hon-
esty; without fraud, collusion, or deceit; actu-
ally without pretense (citing Words and Phras-
es, Good Faith).

Appeal from District Court, Robertson
County; John Watson, Judge.

Action by the Peden Iron & Steel Com-
pany against E. G. Jenkins and others.
Judgment for defendants, motion for new
trial overruled, and plaintiff appeals. Af-
firmed.

Baker, Botts, Parker & Garwood and J.
C. Townes, Jr., all of Houston, Bowers &
Bowers, of Caldwell, and Perry & Woods,
of Franklin, for appellant. C. S. Williams,
of Caldwell, Searcy & Botts, of Brenham,
H. S. Morehead, of Franklin, and W. C. Da-
vis, of Bryan, for appellees.

BROOKE, J. About February 21, 1915, a
flowing well was brought in in the Thrall oil
field, near the town of Thrall, in William-
son county, Tex. The well was on the land
belonging to one Fritz Fuchs. A few days
later another flowing well was brought in on
the Fuchs land, about 150 feet from the first
well, known as the Murphy well. Both of
these flowing wells continued to flow oil,
without apparent diminution as to the quan-
tity of oil produced, until after April 20,
1915. The bringing in of these oil wells in
an entirely new field caused quite a lot of
excitement. About April 1, 1915, the appel-
lees, 20 citizens, formed a pool, each putting
in $300, for the purpose of buying a lease
in this new oil field and developing the same
for oil. E. G. Jenkins was appointed as agent
to visit the field and purchase the lease, if
possible. About April 1st Mr. Jenkins pur-
chased the oil rights on 10 acres of land,
part of the Diebel tract, paying therefor
the sum of $2,500 in cash. This lease car-
ried a three-eighths royalty. Jenkins and
his associates, appellees here, did not at once
incorporate and sell stock and develop the
land. They first had a well sunk on the
land. About April 17, 1915, a flowing well
was brought in. Three or four days before
this well was brought in, a flowing well was
brought in on the Thrall Independent Com-
pany tract, a 10-acre lease adjoining that
owned by appellees; the wells being about 350
feet apart. After the well was brought in,
the owners of the lease, the appellees, visit-
ed Thrall and inspected the well. They
then met at Taylor for the purpose of incor-
porating, and discussed the value of the

⬤═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

lease with the well on it. It was concluded that the lease with the well on it was conservatively worth $120,000, and that the company should be incorporated for that amount; the lease to be transferred to the company as its capital stock, and each one of the incorporators to own an undivided one-twentieth interest therein, for which, after the company was incorporated, stock was to be issued. No one subscribed for any stock in this company or agreed to pay for same. They transferred the 10-acre oil lease, with the flowing well thereon, to the company for $120,000, and were to receive stock of the company in payment for the same. An application for charter was made. The affidavit accompanying the application for the charter was as follows:

"State of Texas, County of Williamson:

"Before me, the undersigned authority, on this day personally appeared J. R. Heslep, T. G. Heslep, and H. H. Womble, known to me, who having been by me first duly sworn, on oath say, each for himself: That they are the identical parties who executed the charter of the Caldwell Oil Company as incorporators, and that the full amount of the capital stock of said company has been in good faith subscribed, and that the full amout thereof has been paid in; that the following are the names and postoffice addresses of the parties subscribing to the capital stock of this company: [Setting out names and post office address of each.] That each of the above subscriptions was paid in full by conveying to the corporation a lease on all the mineral rights on ten acres of land out of the Diebold survey situated near the town of Thrall, in Williamson county, Texas, on which there is now one of the largest producing oil wells that there is in the newly discovered field near the town of Thrall, which is now producing at least 2,500 barrels per day. There is also being drilled on this property two more oil wells and others will be drilled from time to time. The land herein conveyed is more particularly described as follows: [Setting out description of property.]

"We and each of us, whose names are hereunto subscribed, solemnly swear that the value of $120,000, which we have placed on this property, is a reasonable and conservative one, and we further swear that every dollar of the stock of each of the stockholders herein can be sold at par and above."

This affidavit is signed by J. R. Heslep, T. G. Heslep, and H. H., Womble, and duly sworn to. The secretary of state accepted the valuation placed on the property and granted the charter. The company then commenced to do business and purchased some oil machinery, etc., from the agent of appellant, who was on the ground for the purpose of selling the goods, and who saw the well and flow of oil from it before he sold the goods.

After a short while the wells failed, and the corporation was placed in the hands of a receiver. The appellant then filed suit in Williamson county against appellees, seeking to recover from them individually for the goods sold to the corporation, alleging all sorts of fraud in forming the corporation, and charging that the charter was procured from the secretary of state through fraud, etc. The venue of this suit was by consent changed to Robertson county, after which appellant filed its first amended original petition, abandoning the allegations of fraud made in its original petition, seeking to recover against the appellees on the ground that they had overvalued the lease and had not paid for their stock.

The case was tried before a jury, and the only issue for the jury's determination being the reasonable market value of the Caldwell Oil Company's lease on April 20, 1915, and the jury having answered that the market value was $120,000, judgment was rendered in favor of appellees on June 13, 1917. Motion for new trial was by the court overruled, and the case has been properly brought by appeal to this court.

[1] The first assignment of error complains of the action of the court in permitting the witness Dr. Y. F. Hopkins, over the objection of plaintiff, to testify to the effect that he thought he could have sold his certain lease on a certain 10-acre tract of land in the vicinity of the Caldwell Oil Company's lease for $200,000, because and for the reason that said testimony is incompetent and immaterial, in that it does not tend to show the value of the lease in question, and because the same does not show even the market value of said adjacent lease, which said witness testified he could have gotten $200,000 for, and said testimony merely tends to show the opinion of said witness as to the value of said lease, without his first having qualified as an expert upon the value of leases of the same kind and character as the one at issue.

It is contended by appellees, among other things, that if the court committed error in admitting the testimony of Dr. Hopkins, as complained of, which is not admitted, then appellant waived such error by its attorney fully going over the same subject on cross-examination of said witness, and bringing out new and additional testimony of like kind from said witness. Without setting out the testimony of Dr. Hopkins in full, it is sufficient to say that upon cross-examination plaintiff's attorney brought out the following testimony from the witness, which was not testified to on direct examination, to wit:

"I had some people begging me to get my associates together and sell that 20 acres for $250,000. That was the Home Independent, just north and east of the Thrall Independent. That was considerably east of the Caldwell Oil Company's 10-acre tract. It was not close to production. It was further from production; that is, most of it was. There was a little point that ran down just east of the Thrall Independent nearest strip. * * * They were not going to organize a company and give me some stock in it. We were not to have any stock in it. We were not to have anything to do with it. They wanted to buy the lease. That was the last of April, or something like that; during the last few days of April. That was for $250,000 for 20 acres. It was a real estate man or agent who made the offer. I don't know who he was buying for; some Eastern parties."

As before said, nothing was asked this witness on direct examination about this 20-acre lease or its value. In the case of Cathey v. M., K. & T. Ry. Co. of Texas, 104 Tex. 41, 133 S. W. 417, 33 L. R. A. (N. S.) 103, Judge Ramsey, speaking for the Supreme Court, used the following language:

"The position announced in the above case with respect to cross-examination is unsound, yet we understand the rule to be that where a party on cross-examination of a witness, brings out facts not testified to by the witness on direct examination, he makes the witness his witness as to such facts. And if upon cross-examination he brings out similar but different facts to those testified to on direct examination, to which his objection was directed, he waives the objection."

In the case of Provident National Bank of Waco v. Howard, 199 S. W. 658, the court holds that, when a party elicits certain matters from plaintiff on cross-examination, it is harmless to admit the same evidence by a later witness. In the case of Slayden v. Palmo, 108 Tex. 413, 194 S. W. 1104, the Supreme Court held that a case would not be reversed for the admission of improper evidence, when similar testimony had been given without objection.

It will be remembered that the testimony of Dr. Hopkins objected to was that he believed he could have sold his 10-acre lease on a certain 10-acre tract in the vicinity of the Caldwell Oil Company lease for $200,000.

It is further contended by appellees that it was competent for the appellees to show the value of leases adjoining their lease, of similar acreage, location, and character of soil, etc., that, reduced to the last analysis, values are but opinions of witnesses; and, further, that what one can sell his property for is what it is worth, and that when we speak of the market value of property we mean for what it can be sold, and that the witness, having given the facts upon which he based his opinion of values, had the right to give his opinion of what his 10-acre lease, with a flowing well in it, as well as what the Caldwell Oil Company's lease, was worth; and, further, that any person living in the neighborhood of lands and familiar with the same can testify as to their value, and that it is permissible to prove values of lands by comparison with similar lands in the same locality; and it is argued that the property of a corporation is represented by the stock issued to its stockholders, and what the stock sells for is what the corporation is worth; that there are several ways of arriving at the value of the stock or the property belonging to the corporation.

The witness Hopkins testified that the lease of the Independent Thrall adjoined that of the Caldwell Oil Company, and that both had a flowing well on their land, the Caldwell Oil Company's well flowing twice as much oil as the Thrall Independent's well, and further testified that he had bought and sold leases, and that stock in his, or the Independent Thrall, had sold for from $150 to $180 per share, and that he had been offered $200 for some of his stock. It was not error, it is contended, to permit him to state that in his judgment he could have sold the Thrall Independent for $200,000. Having given the facts upon which he based his reason or opinion, the question went to the weight, and not to the admissibility, of the evidence.

It is further argued, and with apparent truth, that the general rule is that the true test of the value of a thing is what it will bring on the market. But, to constitute market value, it must appear that similar things have been bought and sold in the way of trade in sufficient quantity or frequency to establish a market value for such things; that, where there is no market value for the thing, its value must then be ascertained by the circumstances of the case, the intrinsic value of the thing, the cost of it, its uses, the price asked and offered for it, and, indeed, any facts which would naturally affect the mind of parties buying or selling in determining the price asked or given. There was no lease in the Thrall oil field, with a producing well on it, bought or sold, and, that being the case, we are unable to compare what leases with a producing well on them sold for, in determining the value of a lease that had been developed and had a producing flowing well or gusher on it, and so, it is argued, the only way of determining the value of the Caldwell Oil Company's lease, at the time, was to show what stock in this, as well as in the Thrall Independent, sold for, or could have been sold for, and the demand for the property. We are cited to the case of St. Louis & I. M. Ry. Co. v. Maxfield Co., 94 Ark. 138, 126 S. W. 84, 26 L. R. A. (N. S.) 1111, in which the following language is used:

"As a general guide to the range which the testimony should be allowed to assume, we think it safe to say that the landowner should be allowed to state, and have his witness to state, every fact concerning the property which he would naturally be disposed to adduce in order to place it in an advantageous light, if he were attempting to negotiate a sale of it to a private individual. * * * In offering testimony on this issue, the owner was not limited to any pre-existing use of the land. If it was of little value as a farm, or for common uses, and was of great value as mineral land, or as a town site, that fact might be shown, though it had never been so used."

It seems that Dr. Hopkins lived in the neighborhood of the Thrall oil field, visited the field practically every day after the first well came in, bought and sold leases, knew of the excitement created by the bringing in of this field, of the number of people that flocked to the field for investment purposes, brought in a flowing well on a 10-acre lease adjoining that of the Caldwell Company's lease, knew stock in his company had sold for $150 to $180 per share, and he had been offered $200 for some of his stock.

[2] The question is: Was it proper for him to state what his lease with the well on it was worth, or for what, in his judgment, it

could have been sold, and by comparison state what the Caldwell Company's lease with a flowing well on it was worth? We are of opinion that it is proper, in proving the value of the Caldwell Oil Company's lease with a flowing well on it, to show the value of the Independent Thrall 10-acre lease with a flowing well on it, which was adjoining the Caldwell lease, the conditions regarding the two leases, improvements, quality, etc., being alike, and in proving the value of the lease of the Independent Thrall it was proper to prove what it could have been sold for under existing conditions. The well of the Caldwell people was brought in on April 17, 1915. The well of the independent Thrall, on an adjoining lease and out of the same survey, was brought in on April 13, 1916. The Caldwell people incorporated on April 20, 1915. The value placed by them on their property in the corporation is assailed as being excessive. We believe it was proper for the appellees, in showing the value of their 10-acre lease with a flowing well on it, to show the value of the Thrall Independent 10-acre lease with a flowing well on it. The two leases were adjoining and similar with reference to improvements and in other respects, and in showing the value of the Thrall lease it was proper to show what it could have been sold for.

[3] The contention of appellant is that the lease of the Caldwell Oil Company had no market value at the time it was incorporated, or, if it did, that no one could testify as to its value, except some oil experts. Some of these scouts were permitted to tell the jury what, in their opinion, the lease was worth, although each of them admitted on cross-examination that no one could tell where oil was located, or when found, how long it would last, etc., and that property was worth what you could sell it for. Therefore we believe it was proper, the appellant having introduced this character of testimony, for appellees to show by Dr. Hopkins, who lived in the neighborhood of the Thrall field, visited the field daily from the time the original well was brought in, bought and sold leases, saw trading in them, developed a 10-acre lease adjoining the Caldwell lease, knew of stock in his well selling for from $150 to $180 per share, was offered $200 per share for some of his stock, the par value being $10, the value of his well, for what it could have been sold, and by comparison state what in his judgment the Caldwell Company's lease with the well on it was worth. Therefore we hold that, if the admission of this testimony was error, it is not reversible error, under the circumstances of this case. Therefore the assignment is overruled. City of Ft. Worth v. Charbonneau, 166 S. W. 387; Boyce v. Gingrich, 154 Mo. App. 198, 134 S. W. 81; Railway Co. v. Maxfield Co., 94 Ark. 135, 126 S. W. 85, 26 L. R. A. (N. S.) 1111; Railway Co. v. Davis, 1 White & W. Civ. Cas. Ct. App. § 147, p. 58; State v. Meysenburg, 171 Mo. 1, 71 S. W. 239; Brinkerhoff v. Home Lbr. Co., 118 Mo. 447, 24 S. W. 133; Railway Co. v. Hill, 70 Tex. 54, 7 S. W. 659; Railway Co. v. Mackie, 71 Tex. 498, 9 S. W. 451, 1 L. R. A. 804, 10 Am. St. Rep. 766; Letcher v. Morrison, 79 Tex. 241, 14 S. W. 1010; Wallis v. Schneider, 79 Tex. 479, 15 S. W. 492; Slayden v. Palmo, 108 Tex. 413, 194 S. W. 1103; Railway Co. v. Packard, 193 S. W. 397.

The second assignment of error complains that the court erred in permitting the witness, Dr. L. L. Lee, to testify over the objection of plaintiff with reference to what he was offered for a 10-acre lease owned by him, as is more fully shown in plaintiff's bill of exception No. 21. The issue in the case was the market value of the Caldwell Oil Company's lease. The contention of appellees is that appellant was contending, among other things, that the Thrall oil field had not settled down to a steady production, and that there was no way of showing it had a market value, although it introduced a lot of oil scouts, who attempted to show that the lease was not worth $120,000. It was contended that it was proper, therefore, under the circumstances, to show the value of this lease, by showing, not only what similar leases sold for, but what they could have been sold for; there being no market value for the stock or property on April 20, 1915, and the purpose of appellant being to show that, on account of the well on the lease of appellees having been brought in on the 17th of April, 1915, and the corporation formed on April 20, 1915, that there was no market value for the stock or property at this particular time, that the only way market value could be proven for this property was by a lot of oil scouts, who were familiar with the different oil fields in Texas, and had had experience in buying and selling oil leases in other places, but not in this field. On the contrary, the contention of appellees was that the lease with the oil well on it was worth $120,000, the amount they incorporated for, and that in proving the value of the lease they were not confined to the oil experts, but anybody familiar with the property and locality of the lease, and conditions existing at the time, could testify, and that in testifying as to the value of other property in the neighborhood similarly situated, what stock in this company and other companies similarly situated with reference to improvements, etc., sold for, was proper to go to the jury to aid them in arriving at what the property was worth. And it is further contended by appellees that the general rule is that the true test of the value of a thing is what it will bring in the market; that, where there is no market value for such a thing, its value must then be ascertained by the circumstances of the case, the intrinsic value of the thing, the cost of it, its uses, the prices asked and offered for it, and, indeed, any facts which would naturally affect the minds of

the parties buying or selling, in determining the price to be asked or given. The fact that no 10-acre lease in the Thrall oil field with a flowing well on it was sold, and it being thereby impossible to show the sale of property substantially similar to that of the Caldwell Oil Company, would not, in our judgment, render the lease valueless, nor would it preclude the appellees from showing its value in other ways. The Lee lease was adjoining the Caldwell Oil Company's lease on the north, the appearance of the land from the surface being the same as that of the Caldwell Company's, and, in our judgment, it was proper to show what Dr. Lee was offered for his lease, as well as what he sold part of it for. The assignment is overruled.

[4] The third assignment complains that the court erred in permitting the witness Lee to testify, over the objection of plaintiff, that in his opinion the fair and reasonable market value of the Caldwell 10 acres of land with a well on it was, in April, 1915, the sum of $120,000, because, in the first place, the witness was not qualified to give an opinion with reference to the value of the said oil land, because he had not been sufficiently qualified, and had no experience whatever in the oil business prior to said April, 1915, and for the further reason that said question and the answer thereto sought to be elicited were wholly irrelevant and immaterial, because the inquiry was with reference to the value of a 10 acres of land, and the only matter to be determined by the jury was as to the value of the Caldwell lease, and therefore the testimony of the said witness Lee was wholly irrelevant and immaterial, and prejudicial to the rights of the plaintiff. The witness Lee stated that he knew the market value of the property in the Thrall oil field, and of that belonging to the appellees, and it was proper for him to state the facts upon which he based his opinion. He stated:

"I was about the Thrall oil field during the spring of 1915, while that oil excitement was going on. I stayed there nearly all the time for about two months. I do remember the well that was brought in by the Caldwell oil people. I had a lease adjoining it on the north. My lease was also on the Diebold survey. There were 10 acres in my lease. There was development going on on my land at the time the Caldwell people brought in their well. I was having a well bored. I did sell some of my property. I sold a quarter of an acre, and then sold one-sixth of an acre. I got $2,000 for the quarter acre, and I retained a one-eighth royalty above the royalty I was giving. I sold my one-sixth of an acre at $500, with the royalty of the same. I did have a number of offers to sell that whole 10-acre lease. The best offer I had was $50,000. There was no producing well on it. That lease was on the north and adjoining the lease owned by the Caldwell people; the Caldwell people were directly south of my tract. There was quite a good deal of activity in the real estate market for oil purposes, and a good many people were up there buying and selling leases. After the Caldwell oil well was brought in, it had a very stimulating effect on property in the neighborhood, in that neighborhood. The people were nearly

crazy, and went wild after that. It did not look like values had much of a limit. It didn't look like there was any limit to what they would pay for it after the well came in. That well was one of the best producers in the field. I saw it, and saw the other wells, and I think it the second best I have seen in the field. The best well was the Murphy well. I do know what lands were selling for in that neighborhood at that time, and I also know what the market value of property was then. I had bought and sold and seen other property sell, and I think I know about what it brought at that time. After having stated the facts with reference to this matter that I have, I should think that $150,000 would not have been at all unreasonable as the fair reasonable market value of that 10-acre tract of land with that well on it on April 20, 1915, three days after it came in. Taking the sentiment present at that time, I think $120,000 was a conservative estimate of the value of the property at that time."

The subject of inquiry was the value of the lease owned by the Caldwell people. It is our opinion that there was no prejudice to the appellant in this testimony, and the assignment is overruled.

[5] The fourth assignment of error complains of the action of the court in permitting the witness L. W. Hensley to testify over the objection of the plaintiff with reference to the value of the Caldwell oil lease, because the testimony clearly shows that the said witness was not qualified to give an opinion as to the value of said oil lease; he having had no experience in the oil business, and had no information with reference to the values of oil leases, and had not seen any sales made in the oil field of Thrall, and therefore was wholly disqualified from testifying as to the value of the said oil lease. This testimony was objected to on the trial of the case, which objections were overruled, and the witness permitted to testify what, in his opinion, was the value of the oil lease. It seems that Hensley was one of the original incorporators, and he was permitted to state to the jury the reasons he had for placing the value he did on the lease, and his testimony shows substantially:

That he had held a position of sheriff of the county for about 12 years. That they put up the money for the lease, and that they sent Jenkins to purchase the property. That after the purchase of that lease they put down a well, and got a flowing well. That they drilled six wells all told; that No. 2 was a flowing well, and the other wells had a little oil, but not very good. That he had occasion, after well No. 2 came in, to go into Thrall and measure the oil that came out of No. 1. "J. Louis Giddings, B. F. Delemater, and myself went up there and measured the oil in that well. The way we measured it was we had two tanks. I don't remember what they were, but I believe they were 1,000 barrels and 1,600 barrels. We had a measuring pole, and we put it in the tank to see how deep the oil was, then turned the oil in for a certain number of hours, I believe 12, and then calculated to see what it was putting out in 24 hours; the two wells, first one, and then the other. According to our calculations, both wells having been turned in, they were producing about 1,300 barrels per day. That was something like two weeks after we incorporated. I was present the night they agreed to incorporate at Taylor, and was also present when we fixed the value of the land at $120,000.

We believed that this well was putting out anywhere from 2,000 to 2,500 barrels per day, and we were getting something like 45 cents per barrel for the oil, so we knew that would be something like $1,000 to $1,200 per day, and that is the basis on which we figured and arrived at that $120,000 valuation. We estimated among ourselves that it was really worth $200,-000. We made that estimate on the well's production, and we put it in at $120,000. I did not offer to sell any of my stock in that well, because it was not for sale. I did enter into an' agreement among the majority of the stockholders to hold it. That agreement was that we would hold our stock and not sell it. We put a value of $50 on the stock; that is, 2½ for 1."

Taking in consideration the fact that the appellant claimed that the lease was not worth anything like what it was valued at, and placed in the corporation for, in our judgment it was proper, under the circumstances, for the witness to testify how he and his associates arrived at the value they placed on the lease, and that the way they arrived at the value of the property was to show the revenue it was producing. The Fuchs and Murphy wells were still producing apparently the same amount of oil as when first brought in, which had been two months before the Caldwell Oil Company brought in their well. Therefore these people had the right to presume that this well would continue to flow oil, together with the other wells to be sunk by them on the lease, and to value it accordingly. The jury were entitled to know the facts, and in our judgment the assignment must be overruled.

[6]' The fifth assignment complains that the court erred in permitting the witness Dr. L. L. Lee to testify, over the objection of the plaintiff, that he had sold one-fourth of an acre of land near the Caldwell Oil Company's lease for $2,000, and one-sixteenth of an acre near the said lease for the sum of $500, because the testimony was wholly irrelevant and immaterial, and no evidence was shown that the land sold by Dr. Lee and the land on which the Caldwell lease was were in any manner similar, and nothing is shown with reference to whether or not the royalties on the land were the same or different, and for the further reason that the value of the Caldwell lease could not be determined by showing what a segregated one-fourth acre of another tract might sell for, as it is a matter of common knowledge, and is also shown by the evidence in the record, that a larger price can be obtained for small tracts than for large tracts. Without going into the matter at length, we are of opinion that there is no merit in the assignment, and it is therefore overruled.

The sixth assignment complains that the court erred in permitting the witness J. R. Fraim to testify, over the objection of the plaintiff, with reference to what one-sixteenth of an acre and one-fourth of an acre in the Thrall oil field sold for, because it was not shown that these tracts were simi-lar to the Caldwell Oil Company's 10-acre lease with reference to quantity, quality, character of improvements, and terms of the lease, and further because it is an undisputed fact in this record, testified to by defendants' own witnesses, that a tract of one-fourth of an acre, or one-sixteenth of an acre, would sell for more money per acre than a 10-acre tract, and further because the proof of isolated sales is not competent to establish the market value of other property. It is urged by appellee that there was no error in the action of the court in permitting the witness to give the testimony complained of in this assignment of error; that appellant, upon cross-examination, caused this witness to testify to similar matters not brought out on direct examination; that the witness testified that he thought this sale was before April 20, 1915; that it was after the Caldwell well came in; that this piece of ground adjoined that of appellees, and it was therefore admissible to show what it sold for, as a circumstance in establishing value. We are of opinion that there is no merit in the assignment, and same is overruled.

[7] The seventh assignment complains that the court erred in permitting the witness G. W. Grant to testify, over the objection of plaintiff, with reference to what he was offered for some of the stock of the Caldwell Oil Company, because the said offers could not constitute the value of the said Caldwell oil lease. This assignment will be considered in connection with the eighth and ninth assignments, which will be grouped and considered together. It will be noted that appellees, in making application for the charter to the secretary of state, having stated, in the affidavit accompanying the application with reference to the value of the lease, that "we and each of us, whose names are hereto subscribed, solemnly swear that the value of $120,000 which we have placed on this property is reasonable and conservative, and we further swear that every dollar of the stock of each of the stockholders herein can be sold at par and above," it was proper, in our judgment, to show what was offered for the stock and what it was sold for. The stock represented the property of the corporation, and, if the stock could have been sold for par, then the lease with the well on it was worth $120,000, the value placed on it by appellees. We find no merit in these assignments, and they are therefore overruled.

The tenth assignment complains that the court erred in permitting the witnesses M. D. Rodgers, J. R. Fraim, G. W. Grant, C. C. Nelms, E. G. Jenkins, C. B. Oliver, J. E. Giddings, L. L. Lee, and T. G. Heslep to testify over the objection of plaintiff with reference to what the stock in the Caldwell Oil Company sold for; and the eleventh assignment complains of the action of the court in permitting the witness G. W. Grant to tes-

tify, over the objection of plaintiff, that he bought $1,600 worth of the stock in the Caldwell Oil Company at $27 per share, because and for the reason that such testimony does not show that said witness paid the prevailing market price of such stock at said time, but only shows a single and isolated transaction, which cannot and does not prove or establish the reasonable market value of either the stock in the Caldwell Oil Company or the value of the lease held by them. The stock of the Caldwell Oil Company represented the property of the company, and, in order for the jury to arrive at the value of the property of the corporation, it was proper to prove what was offered for the stock, and what the stock in the corporation sold for, and also those applying for the charter of the Caldwell Oil Company, in the affidavit as to the value of the property, having stated that· all of the stock in said company could be sold for par and better, it was proper to permit the witnesses to state what was offered for the stock, and what it actually sold for, and if all of the stock in the Caldwell Oil Company could have been sold for par, or better, then the property of the corporation was worth $120,000. The assignments are overruled.

The twelfth, thirteenth, fourteenth, and fifteenth assignments of error are considered together. These assignments are:

(a) "The court erred in permitting the witness T. Kraitcher to testify, over the objection of the plaintiff, that he traded two certain houses and certain town lots upon which said houses were situated, which he considered to be worth $2,-000, for 80 shares of the stock of the Caldwell Oil Company, because and for the reason that such testimony is inadmissible and incompetent to prove the value of the lease of the Caldwell Oil Company, which was the only issue in question, since market value contemplates a sale for cash, and not a mere trade for other property, and such proof as to what the stock of the Caldwell Oil Company may have been traded for, and for other property, would not and could not establish the cash market value of such stock or of said lease, all of which is more fully shown by plaintiff's bill of exception."

(b) "The court erred in permitting the witness T. Kraitcher to testify, over the objection of the plaintiff, that he traded an Overland automobile for 7 shares of the stock of the Caldwell Oil Company, said trade being made with Ed Dusek, and that said Dusek afterwards sold said automobile for $300, because and for the reason that said testimony was incompetent and inadmissible as tending to show the reasonable market value of the stock of the Caldwell Oil Company or the market value of the lease of said company, and because market value of the stock or lease cannot be proven by evidence as to what certain stock may have brought when traded for other property, unless the market value of such other property be also shown in connection therewith, which the defendants failed to do in this case."

(c) "The court erred in permitting the witness E. G. Jenkins to testify, over the objection of the plaintiff, that he traded an automobile worth $800 for 40 shares of stock in the Caldwell Oil Company, because said testimony was ir-··elevant and immaterial, and had nothing to do with the inquiry involved in this suit, that ɪs, as to the market value of the lease owned by the Caldwell Oil Company, and further be-

cause what he traded for the said stock could not constitute the market value of the lease or of the shares of stock in the said· corporation, because the said testimony involved collateral issues; that is, even if under any circumstances the testimony was admissible as to what the automobile sold for, certainly it was not admissible as to a trade, as it was necessary to show the market value of the automobile before the jury could even find what the stock cost the said witness, all of which testimony was objected and excepted to."

(d) "The court erred in permitting the witness J. L. Giddings to testify, over the objection of the plaintiff, that he traded for some of the Caldwell Oil Company's stock an automobile and house, and gave in such trade from $20 to $30 per share, for the reason that said testimony could not throw any light upon the value of the Caldwell Oil Company's lease, and for the further reason that the market value of a thing· cannot be proven by showing what the things were traded for, or the amount received therefor in a trade, and for the further reason that the market value of the stock could not be the basis for estimating the value of the lease, and also because isolated cases of trades cannot show the market value of a thing."

[8] Appellant's contention in the court below was that the property had no market value, for the reason that no 10-acre lease similarly situated in the Thrall field had been sold, and that no market value had been established for the stock, and plaintiff offered its oil scouts to prove the value of this lease. We believe the testimony of the witnesses complained ·of was admissible, as a circumstance to show the value of the property owned by the Caldwell Oil Company; its weight was for the jury. All of the witnesses whose testimony was complained of in the above assignments stated without objection the value of the property they traded for stock in the company, or traded stock in the company for. A critical examination of the testimony shows that there is no merit in the assignments, and therefore they are overruled.

The sixteenth and seventeenth assignments of error are as follows:

(a) "The court· erred in permitting the witness L. S. Hensley to testify, over the objection of the plaintiff, with reference to the manner in which the value of the Caldwell Oil lease was ascertained by the several owners thereof at the time the charter of the Caldwell Oil Company was obtained from the secretary of state."

(b) "The court erred in permitting the witness C. B. Oliver to testify, over the objection of the plaintiff, with reference to the manner in which the value of the Caldwell oil lease was ascertained by the several owners thereof at the time the charter of the Caldwell Oil Company was obtained from the secretary of state."

The assignments are overruled.

The eighteenth assignment challenges the action of the lower court as being error in permitting the witness J. R. Fraim to testify over the objection of the plaintiff with reference to what he could have sold the stock of the Caldwell Oil Company for, because such testimony was irrelevant and immaterial, and because proof of what stock in the Caldwell Oil Company could have been sold for is not admissible to show the market value of the lease in question; further because

the dates upon which said sale or sales could have been made by the said Fraim do not appear; and further because testimony from a witness as to what he believes he could have sold stock for is incompetent to show the market value of the stock, and certainly is incompetent to show the market value of a lease owned by the company. From what has been said heretofore, it follows that these assignments must be overruled.

The nineteenth assignment claims that the court erred in permitting the witness Dr. Y. F. Hopkins to testify, over the objection of the plaintiff, to the market value of the Caldwell Oil Company's 10-acre lease, because it was not shown that said witness knew the market value of said lease, or was in a position to know, or had such training and information as would permit him to give his opinion as an expert. Dr. Hopkins having been shown to be familiar with the value of property for oil purposes, it was proper to state the facts upon which he based his estimate of the value of the property. The assignment is overruled.

The twentieth and twenty-first assignments complain that the court erred in permitting the witness Dr. Hopkins to testify with reference to what the stock of the Thrall Independent Oil Company sold for, because the market value of stock in the Thrall Independent Company's 10-acre lease cannot be established by the proof of isolated sales of stock in that company, and in permitting him to testify over objection of plaintiff as to what the lease owned by the Thrall Independent Oil Company could be sold for. We have considered this matter heretofore, and there is no merit in the assignments, and same are overruled.

[9] The twenty-second assignment complains of the verdict of the jury as being against the great weight and preponderance of the evidence, in that the lease in controversy was not worth over $25,000 at the time of the incorporation of the Caldwell Oil Company. This is a voluminous record. The case was submitted to the jury on special issues. The jury returned a verdict that the lease, with the well on it, at the time the Caldwell Oil Company was incorporated, was worth $120,000. No complaint is made with reference to improper conduct on the part of the jury, and in our judgment the evidence sustains the verdict of the jury.

[10] The statutes of this state authorizing the creation of private corporations provide that, whenever the stockholders of such company shall furnish satisfactory evidence to the secretary of state that the full amount of the authorized capital stock has in good faith been subscribed, and 50 per cent. thereof paid in cash, or its equivalent in other property or labor done, the product of which shall be to the company of the actual value at which it was taken or property received, it shall be the duty of said officer, on the payment of the official fee and franchise tax,

to receive, file, and record the charter of such company in his office, and give a certificate showing the record thereof. It is further provided that the satisfactory evidence shall consist, among other things, of those who execute the charter stating the cash value of any property received, giving its description and location, from whom and the price at which it is received, and that, if the secretary of state is not satisfied, he may, at the expense of the incorporators, require other and more satisfactory evidence before he shall be required to receive, file, and record said charter. The subscribers in the instant case to the charter fully complied with this section in every respect. The secretary of state was satisfied with the value placed upon the property and recorded the charter as required by law. The secretary of state being the officer appointed by the state to pass upon the value of property, his acts in accepting the value placed upon the property are prima facie right, and can only be called in question in case of fraud. We understand in this case that there is no contention on the part of appellant that appellees fraudulently overvalued the lease, and there is no claim that they knowingly placed a fictitious value on the property, and deliberately perpetrated a fraud on the secretary of state.

In the case of Coit v. Gold Amalgamated Co., 119 U. S. 345, 7 Sup. Ct. 233, 30 L. Ed. 420, the court uses the following language:

"When the charter authorizes capital stock to be paid in property, and the shareholders honestly and in good faith put in property instead of money in payment of their subscriptions, third parties have no ground for complaint. The case is very different from that in which subscription to stock is payable in cash, and where only a part of the installment has been paid. In that case there is still a debt due to the corporation, which, if it becomes insolvent, may be sequestered in equity by the creditors, as a trust fund liable to the payment of their debts. But where full-paid stock is issued for property received, there must be actual fraud in the transaction to enable the creditors of the corporation to call the stockholders to account. A gross and over valuation of property would be strong evidence of fraud."

In the case of Tuck v. Downing, 76 Ill. 71, the court says:

"No man, however scientific he may be, could certainly state how a mine, with the most flattering outcrop or blowout, will finally turn out. It is to be fully tested and worked by men of skill and judgment. Mines are not purchased and sold on a warranty, but on the prospect. The sight determines the purchase. If very flattering, a party is willing to pay largely for the chance. There is no other sensible or known mode of selling this kind of property. It is, in the nature of things utterly speculative, and every one knows the business is of the most fluctuating and hazardous character. How many mines have not sustained the hopes created by their outcrop!"

In the case of Young v. Erie Iron Co., 65 Mich. 111, 31 N. W. 814, it is said:

"But it is equally well settled that such corporators are not responsible for an honest error of judgment, or a mistake in placing a valuation upon property appropriated or used

as capital by a' manufacturing or mining company. Nor can the fact that a jury or court finds property of the nature of a leasehold necessarily fluctuating and speculative in value, worthless now, and but of little actual value at the time of its appropriation as capital, be controlling in deciding whether or not such appropriation was fraudulent as against the creditors of the corporation. Such finding will be presumptive evidence of fraud; but if it be shown that those forming the company honestly believed it to be worth the amount specified in the articles, and that their mistake was one of judgment only, their action cannot be considered fraud, either in fact or law. The law imposes no penalty of this kind upon the stockholders or trustees of a company for a mistake or erroneous judgment in the honest and faithful discharge of his duties."

[11] All of the testimony that was admitted in this case by the trial court, over the objection of appellant, and especially that by appellees as to how they came to place the value they did on the lease, was admissible on the question of their good faith in valuing the property as they did. The expression "good faith," as it is used in law, simply means:

"Honestly; without fraud, collusion, or deceit; really, actually, without pretense." Words and Phrases, vol. 4, p. 3117.

Article 1210, Vernon's Sayles' Statutes, reads as follows:

"No stockholder shall be liable to pay the debts of the corporation beyond the amount unpaid on his stock."

At the time the corporation was formed, it owed no debts. Appellant's claim and other debts were created after the corporation was formed. Appellant had its agent on the ground to see the conditions and to sell its goods. He saw the well brought in by the Caldwell Oil Company, and was anxious to and did sell said corporation the goods. He sold the goods to the Caldwell Oil Company, and probably expected the well to continue to flow in oil, and, if it did, he was taking no risk in selling the goods to the company. There was no show at concealment on the part of appellees as to what constituted the capital stock of the Caldwell Oil Company. The agent of the company saw the well producing oil, and sold the goods to the company on the strength of it.

A careful examination of the record leads us to the conclusion that the case was fairly tried, and that there was no error committed in the trial thereof. It is therefore in all things affirmed.

## On Second Motion for Rehearing.

We desire to say that in our original opinion we cite the case of Cathey v. M., K. & T. Ry. Co., 104 Tex. 41, 133 S. W. 417, 33 L. R. A. (N. S.) 103, and use a quotation therefrom which is apparently not used in said report. However, the confusion was brought about by improper punctuation, and on account of the fact that the opinion does not show where the quotation ended, and where the language of counsel began. Therefore the said case will be omitted from the opinion in this case. However, the views expressed in the remainder of the opinion have not been altered, and in our judgment must be adhered to.

The motion for rehearing is overruled.