145 A.2d 206 (1958)
PIPELIFE CORPORATION, a Delaware corporation, Plaintiff,
v.
Barney F. BEDFORD, John Boles, J. C. Cooper, B. G. Efting, and M. D. Fanning et al., Defendants.
Civ. A. 840.
Court of Chancery of Delaware, New Castle.
July 2, 1958.
*207 Stewart Lynch and Alfred Fraczkowski of Hastings, Lynch & Taylor, Wilmington, and David M. Thornton, Tulsa, Okl., for plaintiff.
Irving Morris of Cohen & Morris, Wilmington, for defendants, Bedford, Cooper, Fanning and Efting.
Howard L. Williams, Edmund D. Lyons and Arthur J. Sullivan, Morris, James, Hitchens & Williams, Wilmington, for certain other defendants.
SEITZ, Chancellor.
This is an action by the corporation to cancel certain of its stock issued, allegedly without consideration, to the defendants, Bedford, Cooper, Fanning and Efting ("defendants") who were the majority of the promoters of the corporation.
In 1949, Arvel C. Curtis ("Curtis"), along with Cleo S. Tomlinson ("Tomlinson"), secured a basic patent dealing with *208 the method of cleaning and coating pipelines internally and in place. Curtis and Tomlinson, as a partnership, commenced the business covered by the patent. Later Tripp, together with members of his family ("Tripp Interests"), bought out Tomlinson. The Tripp Interests and Curtis then formed a Texas corporation, Pipelife, Inc. This corporation took title to the patent and undertook to promote acceptance of the "pipelife process", as it came to be known. The Tripp Interests held 800 shares of Pipelife, Inc., representing a two-thirds interest in the corporation, while Curtis acquired the other 400 shares.
In March 1953, Pipelife, Inc., granted four exclusive licenses: To J. T. and C. H. Owens for Arkansas for an advance royalty of $10,000; to J. T. and C. H. Owens for Louisiana for an advance royalty of $15,000; to I. N. Hart for New Mexico for an advance royalty of $20,000; to the Rice-Denton-Theis, co-partnership, for Texas for an advance royalty of $50,000.
All of the exclusive licenses entitled the licensees to use the inventions of any patents or patent applications then pending or thereafter acquired by the corporation. The term of each license was to end at the term of any patent in the field then owned or thereafter owned by the corporation. The corporation agreed to furnish each licensee with the requisite know-how and information thereafter acquired. All licenses were to be protected by Pipelife, Inc., from competition by unauthorized persons. I might say that all the foregoing protections were subsequently contained in the non-exclusive license which is at the bottom of this litigation.
In the spring of 1954, William Denton ("Denton") a member of the partnership which held the exclusive license for Texas, decided to leave the partnership and secure his own license directly from Pipelife, Inc. Denton, together with George Blair, ("Blair"), an employee of the Texas licensee, approached Pipelife to secure a license. The approach seemed doomed to failure unless Denton and Blair could convince the group that they not only had the necessary know-how but that they could raise the necessary capital to promote the process ($50,000). Thereupon, Denton and Blair sought out Barney F. Bedford ("Bedford"), whom they considered able to raise the capital. Bedford was president of an insurance company with offices in San Angelo, Texas. Bedford at first was not interested but later became interested after a second approach by Denton and Bedford. On the second visit they showed him certain literature extolling the virtues of the Pipelife process, pieces of coated pipe and a booklet showing hundreds of jobs where it had been used. At this time, Bedford brought B. G. Efting into the discussion, which concluded without any definite plan. I should note that some of the promoters subsequently withdrew or for other reasons are not involved in this litigation.
Subsequently, Denton and Blair arranged a conference with Tripp and Curtis of Pipelife, Inc. The meeting took place in late May or early June 1954. While there may be some difference of opinion as to the reason, it does appear that Pipelife was unwilling to grant any more exclusive licenses. I think it is reasonable to infer that this was due in part to their unhappy experience "profit-wise" resulting from the granting of the exclusive licenses for the four states mentioned. At the meeting in question, Curtis and Tripp extolled the virtues of the process and described its potential as unlimited. They told Bedford, Denton, Blair and Efting that the corporation would issue a non-exclusive license for the forty-four states then available. Defendants contend that they were also told that the corporation would not issue competing licenses in such areas if the Bedford group did a "job" in securing the acceptance of the process in the field. This is denied by plaintiff. I shall discuss this later in the opinion.
When the license was about to be issued by Pipelife to the defendants, Joe H. Foy ("Foy") a lawyer in San Angelo, Texas *209 was consulted. He advised Bedford and the others interested in securing the license that they could form a Delaware corporation to which the license to be issued would be transferred for stock of the corporation so long as the property to be transferred would be equal in value to the par value of the shares issued. He further advised the Bedford group that they had to satisfy themselves in some manner as to the actual value of the license. It is contended that Blair then stated that Tripp valued the license at $10,000 per state. Foy expressed the view that this would carry some weight.
Defendants contend and plaintiff denies that at Bedford's request, Denton and Blair secured oral appraisals from Tripp and Curtis which apparently were the same as the later written appraisals given by them for submission to the Texas Securities Commission. This conflict is resolved later in this opinion. Foy gave a written opinion that the non-exclusive license agreement was legally enforceable.
About September 10, 1954, Pipelife issued to Bedford, Efting, Denton, Blair and J. C. Cooper ("Cooper") a non-exclusive license covering the use of the pipelife process. Cooper was brought into the project by Denton and Blair because of his experience in laying pipes and because of his contacts with oil companies.
No cash or other consideration was paid by the Bedford group to Pipelife, Inc., for the license.
Acting on Foy's advice, Bedford, Efting, Denton, Blair and Cooper took the license from Pipelife, Inc., as partners. This was done to take advantage of an exemption under the Texas Securities Act. They then formed a Delaware corporation, Pipecote Service Company, Inc. ("Pipecote"), and Bedford, Denton, Blair, Cooper and Earl Smith, a law partner of Foy, were elected directors. It had an authorized capital of 700,000 shares of $1 par.
At a directors' meeting held September 18, 1954, the Board of Pipecote accepted the partners' offer to sell the license for 367,000 shares fully paid and non-assessable of $1 par stock. The partners, on the same date, assigned their non-exclusive license for the pipelife process to Pipecote in exchange for the issuance of 367,000 shares to them in the same percentages as their partnership interests. The non-exclusive license assigned by the partners was given a fair value of $367,000 according to the minutes of the directors' meeting of Pipecote. It is not recited that the partners obtained the license without any payment.
Four of the five members of the Pipecote board which authorized the issuance of the stock for the non-exclusive license were also licensees, while the fifth was a law partner of their attorney. This then is a case where the sellers of property organize a corporation and, while sitting as the board, place a value on the "property" which they cause the corporation to purchase from them for par value stock. However, at the time there were no "outside" stockholders but such stockholders were in contemplation.
Pipecote sought to raise operating capital but could not do so except in the sale of stock. At a special meeting held September 27, 1954, Pipecote authorized the sale of 100,000 shares of the $1 par value stock at par. The intention to issue these shares was clearly in the minds of the directors at the time they authorized the issuance of stock for their non-exclusive license. Indeed, two of the board were to sell the shares for a 20% commission. These facts clearly appear in the September 18, 1954, minutes of the directors' meeting.
The issue was registered and on October 13, 1954, approved by the Texas Securities Commission. The Offering Circular with other material was filed with the Regional Office of the S. E. C. in Ft. Worth, Texas. The Offering Circular recited that the partners, including the trusters, on September 18, 1954, assigned their *210 rights under the license agreement to the issuer in exchange for 367,000 shares of stock. It is recited that the partners were able to obtain the license on a royalty basis only because of previous business association with Pipelife, resulting in a relation of mutual confidence between them. Finally, it was recited that no cash consideration was paid by the partners for their stock. It was not recited that the license had a value at least equal to the par value of the shares issued therefor. The Tripp and Curtis affidavits as to value were also submitted to the Texas Securities Commission.
In November 1954, the 100,000 shares were sold. Pipecote used about $50,000 of the proceeds to purchase equipment for applying the process in the field. Denton, Blair and Cooper went out to secure work orders for Pipecote in the territory covered by the license.
Differences arose almost immediately between Denton, Blair and the others. Denton and Blair sought to secure another license for the pipelife process from Tripp. When Curtis learned of this he took an active role in persuading Pipecote to purchase the 135,730 shares of Pipecote stock owned by Denton and Blair for $30,000. This purchase was accomplished about December 6, 1954.
While the negotiations concerning the purchase of the Denton and Blair shares were taking place, Curtis suggested that Pipecote acquire the Tripp stock in Pipelife, Inc. The negotiations between Pipecote and the Tripp Interests resulted in the agreement of December 30, 1954, for the sale of the Tripp Interests (two-thirds of all the Pipelife, Inc. stock) to Pipecote for $300,000. To raise this money the directors of Pipecote put up for sale at approximately $2.31 per share, 130,000 of the $1 par value shares acquired from Denton and Blair. They also authorized the sale of 48,527 additional shares at $4 a share. Both sales were registered with the Texas Securities Commission and approved. An Offering Circular was also filed with the S.E.C. on the sale of 48,527 shares. There was disclosure of the fact that there was no cash consideration paid by the organizers to Pipelife, Inc., for the issuance of the non-exclusive license which was assigned to Pipecote for 367,000 shares of its $1 par value shares.
The sales of stock resulted in a raising of the necessary capital to meet Pipecote's commitment to purchase the Tripp stock and the sale was consummated about March 1, 1955.
In the interim, Pipecote and Curtis recognized the mutual advantages which they both thought would result in the association of Curtis with Pipecote. An agreement was executed about December, 1954, whereby Curtis sold his stock in Pipelife, Inc. to Pipecote in exchange for monetary consideration which came to about $66,000 plus a ten year employment contract and a royalty of 1% on all work done by Pipecote with the process.
The result of the Tripp and Curtis contracts with Pipecote was to give it ownership of all Pipelife, Inc. stock and thus the control of the Pipelife process patents in the forty-four states covered by the prior licenses.
No additional licenses were issued by Pipelife. On February 14, 1955, Curtis became a member of Pipecote's board. Shortly after Pipecote acquired the Pipelife, Inc., stock, it caused Pipelife, Inc., the Texas corporation, to be dissolved. About March 29, 1955, Pipecote changed its name to Pipelife Corporation, a Delaware corporation, the plaintiff in this action.
In the period of time during which these various matters arose, attempts were being made to exploit the Pipelife process. There were difficulties arising from the use of faulty materials. There was also lack of a really trained organization. Another big difficulty was the inability to persuade the large companies owning pipes to permit the use of the process to any great extent.
*211 As the time went by after March 1955, the board fell to quarreling. It was constantly faced with the need for additional capital. In May, 1955, the board authorized the issuance of 28,000 shares of the $1.00 par stock at $4.00 per share. The officers and directors purchased almost two-thirds of these shares.
In the late summer of 1955 the Board authorized the sale of 115,000 shares of stock. Bedford and Cooper resigned from the board in August 1955 and formed a partnership and undertook to register the forthcoming sale of stock with the S.E.C. in exchange for the exclusive right to sell the stock. They employed David Thornton an Oklahoma attorney to prepare the necessary papers. Thornton represented Bedford and Cooper in negotiations with Pipelife.
In March 1956, the stock was split four shares of 25 cent par value stock for each share of the existing $1 par value stock. Prior to the unanimous vote of the stockholders in favor of the stock split, Curtis took the floor discussing in detail the stock issued to the organizers in return for the non-exclusive license. After he finished Bedford arose and defended the transaction. The unanimous vote in favor of the split made no exception concerning the stock issued to the organizers.
In the period before the stock split there had been bickering among the board members for some time concerning the stock which had been issued to the organizers without cash being paid to the corporation. In February 1956, at a board meeting, there was some discussion of the matter and a resolution was passed unanimously ratifying all prior actions of the board. At least one director denies that he so voted but I need not resolve this point because I am satisfied that the ratification could not have been and was not intended to cover the action concerning the issuance of stock to the promoters. Indeed, there is a real question as to whether the initial stock issuance to the organizers was a matter contemplated by the resolution.
Curtis, through other parties, solicited proxies for the 1956 meeting. The shares controlled by Bedford, Cooper and Efting were voted by Curtis by proxy in favor of the Curtis slate and were decisive in electing that slate.
In April 1957, the so-called new management initiated this action against these defendants, among others, seeking a decree cancelling their shares of Pipelife stock on the ground that the shares were issued without consideration. It was determined that the court would first determine the issue as against those defendants who received the stock originally (promoters). Decision on the claims against subsequent transferees was deferred.
Since it is of vital importance, I first consider plaintiff's contention and defendants' denial that the 367,000 shares of stock were issued without consideration.
Parenthetically, I do not believe the stock issued was "void" merely because the promoters also dominated the board. I think that action by such a board at such a time is not even voidable in the absence of a showing of some injury to the corporation or stockholders entitled to complain. This seems to be at least implicit in Henderson v. Plymouth Oil, 16 Del.Ch. 347, 141 A. 197, 205. I therefore accept as a premise that plaintiff is not entitled to relief unless there is a showing that the shares were issued to defendants for inadequate consideration.
I believe the circumstances of this case fairly call for the defendants to sustain the burden of showing the adequacy of the consideration. I say this because the defendants were on "both sides" of the transaction when they received and shortly thereafter transferred their license to the corporation for the 367,000 shares of stock. As such they were fiduciaries. Compare Henderson v. Plymouth Oil, *212 above; Ballantine on Corp., (second ed.), p. 800. Also at that very time they intended to sell and thereafter did sell part of the original issue to the general public. Moreover, I do not believe there was any stockholder ratification which would shift the burden, assuming they could ratify the issuance of stock for an inadequate consideration.
In support of their contentions that the non-exclusive license was worth at least $367,000 defendants rely upon certain factors which I shall now discuss.
Defendants first point out that Tripp, then president of the corporation owning the patents, appraised the non-exclusive license at "not less than $400,000". Defendants contend that this appraisal was first orally made and its content brought to the attention of the directors and promoters before they passed their resolution authorizing the issuance of the stock for the license. Admittedly, a written appraisal of that tenor was thereafter signed by Tripp to be used in connection with the corporation's application to the Texas Securities Commission to sell 100,000 shares to the public.
Plaintiff seems to challenge the fact of the existence of an oral appraisal from Tripp at the time of the directors' meeting. It is my view from an overall evaluation of the evidence that the directors did not have any formal appraisal from Tripp at the time of the directors' meeting. It does appear, however, that some of the directors believed or were advised that Tripp said the licenses were worth at least $10,000 per state in the form of advance royalties. I am satisfied that the exclusive versus the non-exclusive feature of the license did not make a very real difference in the directors' views on value.
I am satisfied that the value of the license must be justified on the basis of the facts known to the directors when they authorized the issuance of the stock for the license. 2 Fletcher Cyc. of Corps., (rev. ed.), § 5215.
In any event, I believe that the later written Tripp appraisal, which was not drafted by him, was "puffed up" to persuade the Texas Securities Commission as to the value of the license. I do not believe that Tripp felt or that the directors, in taking their earlier action, relied upon any expressed belief of Tripp's that the non-exclusive license was then worth at least $400,000.
Defendants next rely upon the alleged oral opinion of Curtis, which they say was later reduced to writing, which contained a value of $2,000,000 for the patents. Once again, plaintiff disputes the defendants' contention that there was any oral appraisal by Curtis known to the directors at the time they authorized the issuance of the stock. I am satisfied that no such formal appraisal was known to them, at least no appraisal of the type which would warrant the substantial action taken.
The written appraisal of the patents by Curtis, which was executed by him for purposes of obtaining authority from the Texas Securities Commission to issue stock to the public is open to the objection that it was not in existence when the directors took their action. Furthermore, the written appraisal of Curtis contained no attempt to appraise the non-exclusive license. I am satisfied that the knowledge the directors had of Curtis' idea of value for the non-exclusive license did not justify their conclusion that it was worth at least $367,000.
Defendants next contend that the directors were aware of the unlimited potential of the license as repeatedly expressed by Curtis as well as the successful work experience of the process as evidenced by the number of completed jobs.
It was certainly true that Curtis and Tripp both believed and on numerous occasions expressed their belief to the promoters that the licensed patented process had an unlimited potential. This was, of course, the fact and is apparently the fact today even though the corporation has *213 been unable to "sell" the process to any great extent. Indeed, this point is really at the heart of the case because I am satisfied that all the defendants and all the other parties closely connected with the matter actually knew and believed that the value of the license was only in the ability to exploit it by raising capital and building up an organization of trained personnel with the ability to exploit the process by "selling" it to large companies which could benefit from it.
I think the evidence demonstrates that when the defendants took their 367,000 shares for the non-exclusive license they were merely viewing the shares as the evidence of their percentages of participation in the project, which percentages were being transferred from the partnership to the corporation. I am satisfied that none of them actually believed that the non-exclusive license was then worth $367,000, even allowing for the element of its "potential" in reaching my conclusion. While future earnings is an element of value, Ballantine on Corps., (rev. ed.), p. 798-9, it seems that the directors here did not even attempt to estimate future earnings or otherwise establish any monetary basis for their conclusion apart from the loose approvals by interested parties.
I combine the foregoing facts with the further fact that the defendants were not even potentially in a position to exploit it in a manner which would justify any undue optimism about its financial success. Indeed, the minimum $50,000 capital was not even raised as promised. It must also be kept in mind that while the license itself had some value, the real value had to come from the creation of a selling and operating organization which could produce profits. Certainly the 5% royalty requirement was a negative factor especially since it was based on the gross amount received by the licensee.
Curtis and Tripp were primarily interested in a profitable operation because of the royalty provision in the license agreement. Certainly, when Tripp afterwards signed the appraisal to be presented to the Texas Securities Commission he had a real interest in having it approve the public sale because the money was to be used to buy equipment, etc.,  an indispensable prerequisite to the commencement of work and thus to the possibility of the payment of royalties to the corporation. Tripp was president of the corporation and he and his relatives then had the majority interest therein.
Defendants suggest that they relied upon the successful work experience of the process as evidence of value. The experience with the process, profit-wise, did not warrant reliance of the type which justified the value placed on the license by the promoters on September 18, 1954. In fact, up to that date no one operated the process profitably. In any event, I have doubt that most of the directors were really aware of the past financial history of the process.
Nor does the court believe that the non-exclusive license, even considering its potential, was then worth $367,000. In reaching this conclusion I rely principally upon the following facts:
(1) Its real value lay in its successful exploitation and defendants were not equipped to do that job.
(2) The experience profit-wise had been unsatisfactory.
(3) The non-exclusive nature of the license and the royalty terms were negative factors.
(4) The defendants gave nothing of value for the assignment to them.
(5) The initial capital was not raised by the defendants.
Defendants contend and plaintiff denies that the corporation's agent represented that no competitive licenses would be issued so long as defendants did a good job *214 of exploiting the license. This, say defendants, practically made the license exclusive.
There is nothing in writing to support the defendants' contention. While there may have been some loose understanding concerning this matter, it obviously and clearly was not a matter on which the defendants were entitled to place legal reliance.
The fact that the license was a non-exclusive one, is of course a factor which distinguishes this case from the licenses of an exclusive nature granted for the other four states. Thus, in Curtis' letter of September 20, 1954, to Mr. Denton, it was stated that a $10,000 minimum had been fixed "for any State to be licensed exclusively". I realize that the corporation did not desire to give more exclusive licenses because of its unhappy experience in connection with them, but I do not see how this helps defendants' position as to value.
Valuing a patent is most difficult. See 2 Bonbright, Valuation of Property, p. 918. It's doubly so, a fortiori, where only a non-exclusive license for its use is involved. The real value of the license would arise when a trained and equipped organization came into being which could sell and apply the process. Compare Chicago Motor Vehicle Co. v. American Oak Leather Co., 7 Cir., 141 F. 518, 521. The status of the matter on September 18, 1954 did not justify the optimistic evaluation made.
I therefore conclude that the non-exclusive license assigned to the corporation for the 367,000 shares of $1.00 par stock on September 18, 1954 did not at that time have anything like a fair value of $367,000.
In reaching my conclusion I do not find it necessary to characterize defendants' conduct beyond saying that the evaluation could not have been in "good faith" within the legal requirements of that term. I am satisfied that this is not a case where the statute making the directors' judgment conclusive in absence of actual fraud is operative. Compare Belle Isle Corporation v. MacBean, 30 Del.Ch. 373, 61 A.2d 699, 704-705. I say this of course because it was not an arms-length transaction and a sale of a portion of the original issue to the public was contemplated by the organizers of the corporation at the very time they passed the resolution authorizing the issuance of the stock to themselves. Furthermore, a fiduciary duty was involved. Compare Henderson v. Plymouth Oil Co., above.
Defendants say that, apart, from any question of consideration, the transaction should be sustained for various reasons.
In support of their contention that there was no fraud defendants first rely upon the fact that every stockholder purchased his stock on the basis of an Offering Circular which set forth that the partners paid no cash for the license, or directly or indirectly for their stock; and that the Board which authorized the issuance of the stock for the license was not a disinterested board.
Defendants have the burden. While there was a rather full disclosure of some facts there was nothing to show that the license was not then of a value equivalent to the stock issued therefor. There was no attempt to show, as was the fact, that the value of the license lay in the ability to exploit it with trained personnel and that this was not in existence.
I have found that the stock was in fact issued for an inadequate consideration (in a non-arms length transaction). Consequently, the court questions how far disclosure can be a substitute for compliance with the Delaware Constitutional and statutory requirements that where stock is to be issued for property, such property must have a value at least equaling the full value of the stock. The extent of the disclosure might be persuasive in a "close" value case. This is not such a case where the defendants have the burden.
Defendants next point out that each sale of stock was first approved by the Texas. *215 Securities Commission after disclosure of the facts. Defendants say this approval is conclusive as to value in the absence of fraud, citing Peden Iron & Steel Co. v. Jenkins, Tex.Civ.App., 203 S.W. 180; McAlister v. Eclipse Oil Co., 128 Tex. 449, 98 S.W.2d 171.
While the cited cases dealt with Texas corporations, it does appear as to any corporations doing business in Texas "a permit will be issued [for the sale of stock] if the Commissioner finds that (1) the proposed plan of business of applicant appears to be fair, just and equitable, (2) consideration paid or to be paid for securities by promoters is fair, just and equitable, (3) the securities and methods to be used in disposing of them will not work a fraud upon purchaser thereof".
We thus have a situation where it must be presumed that the Commissioner ruled that the issuance of the securities did not work a fraud on the stockholders. Even if we assume that the Commissioner's ruling applied to the interest of potential creditors, the fact remains that we have here only an administrative ruling apparently predicated on an ex-parte presentation of facts, made largely if not exclusively through the use of documents. I am satisfied that the administrative ruling, while entitled to weight, is not sufficient under the showing here made to preclude a finding as a matter of Delaware corporation law that the consideration received for the stock was not sufficient under our constitution and statute. I so conclude.
The defendants suggest that the S. E. C. gave at least tacit approval to the first and third stock offerings. I do not believe the Act under which the Commission operates has such effect. In any event, I think it is not conclusive even though it may be considered as evidence of good faith.
Defendants next argue that the unanimous approval of the stockholders to a 4 to 1 stock split in March of 1956, immediately following the Curtis-Bedford debate, constituted stockholder ratification of the initial issuance of the stock and approval of the valuation of the property especially since it appears that defendants received their new shares.
I do not believe such facts constitute ratification. There was not a full disclosure provided and, in any event, the vote was not directed toward any issue of the validity of any of the outstanding stock.
I am also unable to find any other basis for the defenses of ratification, estoppel or laches where, as here, the action is by the corporation. Certainly the fact that some of the defendants gave their proxies to be used for the election of some of the present management is no reason to prevent the directors from doing their duty as they see it.
Finally, defendants say the corporation cannot maintain this action because all the stockholders who purchased any of the original issue did so with full knowledge of the facts concerning the issuance of the 367,000 shares.
I have already disposed of this contention in considering a prior contention made by defendants. To repeat, I do not believe defendants sustained their burden as to full disclosure, even if we assume that such disclosure may be a complete substitute for compliance with our Constitutional or statutory requirements concerning the adequacy of consideration received for stock.
I conclude that the license had some value at the time it was issued and consequently the court will hear evidence as to the reasonable value which should be ascribed to it before determining the ultimate relief to which plaintiff is entitled. If the parties desire to submit the matter on the record made the court is inclined to use as a guide the $30,000.00 paid for 135,730 shares of promoters' stock purchased in 1954 from Denton and Blair.
Present order on notice.